IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA

    -v-

JOSEPH BELLA,

            Defendant.

20-CR-104-A
21-CR-31-A

## PLEA AGREEMENT

The defendant, JOSEPH BELLA, and the United States Attorney for the Western District of New York (hereinafter "the government") hereby enter into a plea agreement with the terms and conditions as set out below.

## I. THE PLEAS AND POSSIBLE SENTENCE

1.    The defendant agrees to plead guilty to Counts 3 and 6 of **Superseding Indictment 20-CR-104-A**, which charge:

    a.    In Count 3, a violation of Title 21, United States Code, Section 841(a)(1) (Possession with intent to Distribute and Distribution of Cocaine), for which the maximum possible sentence is a term of imprisonment of twenty years, a fine of $1,000,000, a mandatory $100 special assessment, and a term of supervised release of five (5) years; and

    b.    In Count 6, a violation of Title 18, United States Code, Section 922(g)(3) (Possession of a Firearm and Ammunition by an Unlawful User of Controlled Substances), for which the maximum possible sentence is a term of imprisonment of ten (10) years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of three (3) years.

2.      The defendant further agrees to plead guilty to Counts 1, 5 and 13 of

**Indictment 21-CR-31-A**, which charge:

    a.    In Count 1, a violation of Title 18, United States Code, Section 1343 (Wire Fraud), for which the maximum possible sentence is a term of imprisonment of twenty (20) years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of three (3) years.

    b.    In Count 5, a violation of Title 18, United States Code, Section 1343 (Wire Fraud), for which the maximum possible sentence is a term of imprisonment of twenty (20) years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of three (3) years.

    c.    In Count 13, a violation of Title 18, United States Code, Section 1343 (Wire Fraud), for which the maximum possible sentence is a term of imprisonment of twenty (20) years, a fine of $250,000, a mandatory $100 special assessment, and a term of supervised release of three (3) years.

3.      The defendant understands that the penalties set forth in this paragraph

are the maximum penalties that can be imposed by the Court at sentencing.

4.      The defendant understands that, if it is determined that the defendant has

violated any of the terms and conditions of supervised release, the defendant may be required

to serve in prison all or part of the term of supervised release, up to two (2) years, without

credit for time previously served on supervised release.

## II. ELEMENTS AND FACTUAL BASIS

5.      The defendant understands the nature of the offenses set forth in ¶ 1 and 2 of this agreement and understands that if this case proceeded to trial, the government would be required to prove beyond a reasonable doubt the following elements of the crimes:

**With respect to Count 3 of Superseding Indictment 20-CR-104-A:**

a.      The defendant possessed a controlled substance, namely, cocaine, a Schedule II controlled substance;

b.      the defendant knew he possessed a controlled substance; and

c.      the defendant intended to distribute the controlled substance.

**With respect to Count 6 of Superseding Indictment 20-CR-104-A:**

a.      The defendant knowingly possessed a firearm, as described in Indictment 20-CR-104-A;

b.      at the time the defendant possessed the firearm, the defendant was an unlawful user of a controlled substance;

c.      at the time the defendant possessed the firearm, the defendant knew that he was an unlawful user of a controlled substance; and

d.      that the possession of the firearm was in or affecting commerce.

**With respect to Counts 1, 5, and 13 of Indictment 21-CR-31-A:**

a.      The defendant knowingly devised a scheme to defraud or obtain money or property by means of false or fraudulent pretenses, representations or promises;

b.      the defendant acted with the intent to defraud; and

c.      in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce, or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

## FACTUAL BASIS

6. The defendant and the government agree to the following facts, which form the basis for the entry of the pleas of guilty including relevant conduct:

### Count 3 of Superseding Indictment 20-CR-104-A

a. On April 23, 2020, law enforcement executed a search warrant at the defendant's residence and recovered a digital scale containing cocaine residue, scissors containing cocaine residue, twist-ties containing cocaine residue, and a plastic spoon and a plastic straw containing cocaine residue. Law enforcement also recovered a plastic bag from the inside of the toilet tank with a white substance caked on it, determined to be cocaine. Law enforcement also recovered 0.55 grams of a substance which tested positive for Lisdextamphetamine, 57 grams of substances which tested positive for Psilocybin, 0.3 grams of a substance which tested positive for 3, 4-Methylenedioxymethamphetamine (MDMA), 427.84 grams of substances which tested positive for Tetrahydrocannabinol, and 24 grams of substances which tested positive for Marijuana.

b. The defendant admits that he possessed the controlled substances described above with the intent to distribute them.

c. The defendant admits that, on April 23, 2020, during execution of a search warrant, law enforcement recovered a quantity of cocaine in the toilet tank inside of his residence, and that water had infiltrated the bag and affected law enforcement's ability to accurately weigh the cocaine.

### Count 6 of Superseding Indictment 20-CR-104-A

a. On April 23, 2020, the defendant knowingly possessed a firearm and ammunition. At the time the defendant possessed the firearm and ammunition, the defendant knew that he was an unlawful user of controlled substances, including marijuana and cocaine.

b. On April 23, 2020, while executing a search warrant at the defendant's residence, law enforcement recovered one (1) Harrington and Richardson, model Topper 88, 12-gauge shotgun, bearing serial number AU519161, ten (10) 12-gauge rounds of ammunition labeled "REMINGTON 12 GA" on the headstamp, thirty-three (33) 9mm Luger caliber rounds of ammunition labeled "Blazer 9mm LUGER" on the headstamp, and forty (40) .223 REM caliber rounds of ammunition labeled "Tulammo 223 Rem" on the headstamp.

## Count 1 of Indictment 21-CR-31-A

a.     The defendant is a 25% owner and President of Medcor Staffing, Inc.
       ("Medcor"). Medcor is a medical staffing company based in Buffalo,
       New York, that employed Registered Nurses, Licensed Practical
       Nurses, and Certified Nurse Assistants, and then contracted with
       medical providers to provide nursing services through its employees for
       a fee. Medcor did not own or operate any laboratory facilities and did
       not offer any laboratory storage or testing services.

b.     Victim 1 is a molecular diagnostic testing manufacturer headquartered
       in Salt Lake City, Utah. In late 2019, in response to the COVID-19
       pandemic, Victim 1 developed and marketed a test for Sars-COV-2—
       the virus that causes COVID-19. The COVID-19 Tests could only be
       processed by laboratories certified to perform high-complexity
       molecular testing. Because of this, Victim 1 only sold COVID-19 Tests
       to laboratories certified to perform high-complexity tests, or to approved
       distributors, who re-sold the COVID-19 Tests to such laboratories. This
       was to ensure that the COVID-19 Tests were stored and handled in a
       safe way that preserved the accuracy and efficacy of the tests, and to
       ensure that the COVID-19 Tests were processed safely and effectively—
       thereby maintaining Victim 1's reputation for producing safe and
       accurate molecular diagnostic supplies. Additionally, Victim 1 sought
       to control distribution networks to prevent the distribution of COVID-
       19 Tests to geographic areas where the COVID-19 Tests were not
       authorized for use.

c.     In order to ensure that the COVID-19 Tests were stored, handled, and
       processed safely and effectively, Victim 1 had an approval process
       before it sold the COVID-19 Tests to distributors. Victim 1 was
       primarily concerned with ensuring that distributors were experienced in
       selling molecular-based diagnostic products. This ensured that end users
       obtained complete and accurate information regarding the COVID-19
       Tests, as well as accurate customer support after the sale. Victim 1 was
       also concerned with keeping the molecular testing supplies affordable.
       Therefore, Victim 1 did not sell the COVID-19 Tests to distributors who
       intended to re-sell them above a given price point, generally $14 per test.

d.     In or about March and April 2020, the defendant devised a scheme
       whereby he would misrepresent the business and capabilities of Medcor
       in order to trick and mislead Victim 1 into selling him COVID-19 Tests,
       which he could then resell at a significant mark-up.

e.    In or about March 2020 or April 2020, Person 1, acting in concert with the defendant, contacted Victim 1 on behalf of a company called Clean Earth Products. Person 1 sought to become a distributor of the COVID-19 Tests. On or about April 16, 2020, Person 1 submitted a purchase order to Victim 1 on behalf of Medcor, in which the defendant, through Medcor, sought to purchase 5,000 COVID-19 Tests for $8 per test.

f.    As part of the transaction, the defendant engaged a representative of Victim 1 in a telephone conversation and falsely and fraudulently represented to the representative of Victim 1 that Medcor was an end user of COVID-19 Tests, i.e., a certified laboratory capable of safely and accurately processing COVID-19 Tests. Additionally, the defendant falsely and fraudulently represented to the representative of Victim 1 that Medcor would not re-sell, or attempt to re-sell, the COVID-19 Tests.

g.    Based on these false and fraudulent statements, representations, and promises, Victim 1 sold 5,000 COVID-19 Tests to Medcor for $8 per test.

h.    In fact, Medcor was not an end user of the COVID-19 test kits and was not a laboratory capable of safely and accurately processing the COVID-19 Tests. Had Victim 1 known that Medcor was not a high-complexity laboratory capable of safely and accurately processing the COVID-19 Tests, or that Medcor intended to resell the COVID-19 Tests, Victim 1 would not have sold them to Medcor.

i.    In furtherance of the scheme to defraud Victim 1, on April 16, 2020, the defendant transmitted or caused to be transmitted a $30,000 wire transfer from Bank of America account ending 8936 to Bank of America account ending 0489, which wire transfer was processed using computer servers across state lines.

## Count 5 of Indictment 21-CR-31-A

a.    On March 29, 2020, the defendant created a post on his personal Facebook page advertising that he, through Medcor, was selling FDA-approved COVID-19 Tests.

b.    Facebook was a company headquartered in Menlo Park, California, that offered, among other things, communications over the internet utilizing servers located outside of New York.

c.    From April 2, 2020 to April 23, 2020, the defendant communicated with an undercover federal agent regarding the sale of COVID-19 Tests. The

communications took place by telephone and text message, and by email utilizing the email account JBella@Med-Cor.com.

d.   JBella@Med-Cor.com was an email account hosted by Cloudaccess.net, a company that offered email communication services over the internet through servers located outside of New York and therefore all the defendant's communications on JBella@Med-Cor.com travelled across state lines.

e.   In furtherance of the scheme, the defendant falsely represented to the undercover federal agent that the defendant had 50,000 COVID-19 Tests for sale; that the COVID-19 Tests were being stored in a warehouse in San Diego, California at -20 degrees Celsius; that Medcor was an "exclusive licensed reseller" of the COVID-19 Tests; and that Medcor employed doctors and scientists to answer customers' questions. The defendant offered to sell the COVID-19 Tests to the undercover federal agent for $30 per test, or more, depending on quantity purchased.

f.   In fact, Medcor was not an "exclusive licensed reseller" of COVID-19 Tests and did not employ doctors or others to answer customers' questions or provide support after the sale of such tests. Furthermore, Medcor did not own or possess any COVID-19 Tests at the time that the defendant offered them for sale. The defendant subsequently obtained 5,000 COVID-19 Tests from Victim 1 through fraudulent means and did not ensure that the COVID-19 Tests were properly stored at -20 degrees Celsius, leading to their degradation and ultimately the loss of all 5,000 tests.

g.   The defendant's false statements, representations, and promises were intended to cause victims to purchase COVID-19 Tests at a significantly increased price and through illegitimate channels.

h.   In total, the defendant intended to sell the undercover law enforcement officer 5,000 degraded, unusable COVID-19 Tests under false and fraudulent pretenses for a total of $150,000.

### Count 13 of Indictment 21-CR-31-A

a.   The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief was the Economic Injury Disaster Loan ("EIDL") Program. The EIDL Program was designed to provide low-interest

loans to qualifying small businesses to help them meet financial obligations and operating expenses that would have been met had a disaster not occurred.

b.  To obtain a loan under the EIDL Program, a qualifying business was required to submit an EIDL application to the Small Business Administration ("SBA"). The EIDL application was required to be signed by an authorized representative of the business. The applicant, through the representative, was required to certify, among other things, (a) that the applicant was not "presently subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction"; (b) the applicant's gross revenue for the 12-month period from January 31, 2019 through January 31, 2020; and (c) the applicant's cost of goods sold during the 12-month period from January 31, 2019 through January 31, 2020.

c.  If an applicant was approved for a loan under the EIDL Program, the amount of the loan approved was a function of the applicant's profits over a given period.

d.  On July 29, 2020, the defendant was on federal pretrial release, pursuant to 18 U.S.C. § 3142, after he was charged by Criminal Complaint in Case No. 20-mj-5086 in the Western District of New York.

e.  On July 29, 2020, the defendant directed a subordinate, Witness 1, to submit an application to the SBA for a loan under the EIDL Program for one of his businesses, BuyMyCard, LLC ("BuyMyCard"). The defendant gave Witness 1 the responses that she should include in the loan application.

f.  At the defendant's direction, Witness 1 represented to the SBA that the defendant was not subject to formal criminal charges in any jurisdiction. In fact, at that time the defendant had been charged with several felonies in the Western District of New York by way of Criminal Complaint.

g.  Additionally, at the defendant's direction, Witness 1 represented to the SBA that BuyMyCard's revenue between January 31, 2019 and January 31, 2020 was $500,000. In fact, BuyMyCard's revenue during that period was less than $100,000.

h.  At the defendant's direction, Witness 1 also represented to the SBA that BuyMyCard's cost of goods sold between January 31, 2019 and January 31, 2020 was $0. In fact, BuyMyCard's cost of goods sold during that time period was significantly more than $0.

i.    Based on these false representations, the SBA approved and funded a $149,900 loan to BuyMyCard.

j.    For the purpose of executing this scheme, the defendant transmitted, or caused to be transmitted, an electronic submission of the EIDL application from Buffalo, New York to an SBA contractor in Des Moines, Iowa via the internet.

k.    After the Indictment was returned in Case No. 21-CR-31, the defendant engaged in telephone conversations with another employee of his, Individual 1, while he was detained and held in the Niagara County Jail. During those conversations, the defendant and Individual 1 discussed their ongoing efforts to convince Witness 1 to provide false statements regarding the defendant's involvement in the charged offense . The defendant admits that the defendant's goal was to convince Witness 1 to falsely claim that the figures provided on the EIDL application were a simple typographical mistake or communication error, and that the defendant did not, in fact, instruct her to input those figures.

## Relevant Conduct to Indictment 21-CR-31-A

a.    On April 7, 2020, the defendant submitted an online PPP loan application to Bank of America. The application was electronically signed by the defendant, Joseph C. Bella III.

b.    The Bank of America loan application contained the following false representations or certifications:

1.    The defendant certified that he was "not engaged in any activity that is illegal under federal, state or locate law," when, in fact, starting on March 29, 2020, the defendant was engaged in wire fraud violations as described above; and

2.    The defendant answered "no" to a question that asked whether an owner of the applicant was subject "to an indictment, criminal information, arraignment or other means by which formal criminal charges are brought in any jurisdiction." In fact, the defendant was charged with Aggravated Harassment in the 2nd Degree, an A misdemeanor, on October 26, 2019 and was arraigned in Orchard Park Town Court on November 19, 2019. The charges were pending on April 8, 2020.

## III. SENTENCING GUIDELINES

7.     The defendant understands that the Court must consider but is not bound by the Sentencing Guidelines (Sentencing Reform Act of 1984).

## BASE OFFENSE LEVEL FOR SUPERSEDING INDICTMENT 20-CR-104-A

8.     The government and the defendant agree that Guidelines § § 2D1.1(a)(5) and 2D1.1(c)(14) apply to the offenses of conviction for Superseding Indictment 20-CR-104-A and provides for a base offense level of **12**.

## SPECIFIC OFFENSE CHARACTERISTICS FOR SUPERSEDING INDICTMENT 20-CR-104-A

### U.S.S.G. CHAPTER 2 ADJUSTMENTS

9.     The government and the defendant agree that the following specific offense characteristics apply to the offenses of conviction for Superseding Indictment 20-CR-104-A:

   a.     The **2** level increase pursuant to Guidelines § 2D1.1(b)(1) (possession of a dangerous weapon/firearm).

### U.S.S.G. CHAPTER 3 ADJUSTMENTS FOR SUPERSEDING INDICTMENT 20-CR-104-A

10.     With regard to the offenses of conviction for Superseding Indictment 20-CR-104-A, the government maintains that the following Chapter 3 adjustment does apply:

   a.     The **2** level increase pursuant to Guidelines § 3C1.1 (obstructing or impeding the administration of justice).

The defendant specifically reserves the right at the time of sentencing to argue to the Court that this increase does not apply.

10

## ADJUSTED OFFENSE LEVEL FOR SUPERSEDING INDICTMENT 20-CR-104-A

11.     Based on the foregoing, with regard to the offenses of conviction for Superseding Indictment 20-CR-104-A, it is the understanding of the government and the defendant that the adjusted offense level for the offense of conviction is either 16 (if Guidelines § 3C1.1 does apply), or 14 (if Guidelines § 3C1.1 does not apply).

## BASE OFFENSE LEVEL FOR INDICTMENT 21-CR-31-A

12.     The government and the defendant agree that Guidelines § 2B1.1(a)(7) applies to the offenses of conviction for Indictment 21-CR-31-A and provides for a base offense level of 7.

## SPECIFIC OFFENSE CHARACTERISTICS FOR INDICTMENT 21-CR-31-A

### U.S.S.G. CHAPTER 2 ADJUSTMENTS

13.     The government and the defendant agree that the following specific offense characteristic applies to the offenses of conviction for Indictment 21-CR-31-A:

a.      The **12** level increase pursuant to Guidelines § 2B1.1(b)(1)(G) (loss amount between $250,000 and $550,000).

11

## U.S.S.G. CHAPTER 3 ADJUSTMENTS FOR INDICTMENT 21-CR-31-A

14.     With regard to the offenses of conviction for Indictment 21-CR-31-A, the government and the defendant agree that the following Chapter 3 adjustments apply to the offenses of conviction:

   a.    The **2** level upward adjustment of Guidelines § 3C1.1 (obstructing or impeding the administration of justice); and

   b.    The **3** level upward adjustment of Guidelines § 3C1.3 (commission of offense while on release).

15.     The government maintains that the following Chapter 3 adjustment does apply:

   a.    The **2** level increase pursuant to Guidelines § 3B1.2 (abuse of a position of trust or a special skill).

The defendant specifically reserves the right at the time of sentencing to argue to the Court that this increase does not apply.

## ADJUSTED OFFENSE LEVEL FOR INDICTMENT 21-CR-31-A

16.     Based on the foregoing, with regard to the offenses of conviction for Indictment 21-CR-31-A, it is the understanding of the government and the defendant that the adjusted offense level for the offense of conviction is either 26 (if Guidelines § 3B1.2 does apply), or 24 (if Guidelines § 3B1.2 does not apply).

## COMBINED OFFNESE LEVEL FOR SUPERSEDING INDICTMENT 20-CR-104-A AND INDICTMENT 21-CR-31-A

17.     Based on the foregoing and Guidelines § § 3D1.2(d) and 3D1.4, the government and the defendant agree that the combined total offense level for the offenses of conviction for Indictmentsa 21-CR-31-A and 20-CR-104-A is:

    a.  **26** (if Guidelines Section 3B1.2 applies to Indictment 20-CR-31-A);

    b.  **25** (if Guidelines Section 3B1.2 does not apply to Indictment 20-CR-31-A, and Guidelines Section 3C1.1 does apply to Superseding Indictment 20-CR-104-A); or

    c.  **24** (if Guidelines Section 3B1.2 does not apply to Indictment 21-CR-31-A, and Guidelines Section 3C1.1 does apply to Superseding Indictment 20-CR-104-A).

## ACCEPTANCE OF RESPONSIBILITY

18.     At sentencing, the government agrees not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines § 3E1.1(a) (acceptance of responsibility) and further agrees to move the Court to apply the additional one (1) level downward adjustment of Guidelines § 3E1.1(b), which would result in a total offense level of:

    a.     **23** (if Guidelines Section 3B1.2 applies to Indictment 20-CR-31-A);

    b.     **22** (if Guidelines Section 3B1.2 does not apply to Indictment 20-CR-31-A, and Guidelines Section 3C1.1 does apply to Superseding Indictment 20-CR-104-A); or

    c.     **21** (if Guidelines Section 3B1.2 does not apply to Indictment 21-CR-31-A, and Guidelines Section 3C1.1 does apply to Superseding Indictment 20-CR-104-A).

## CRIMINAL HISTORY CATEGORY

19.     It is the understanding of the government and the defendant that the defendant's criminal history category is I. The defendant understands that if the defendant is sentenced for, or convicted of, any other charges prior to sentencing in this action the defendant's criminal history category may increase. The defendant understands that the defendant has no right to withdraw the pleas of guilty based on the Court's determination of the defendant's criminal history category.

## GUIDELINES' APPLICATION, CALCULATIONS, AND IMPACT

20.     It is the understanding of the government and the defendant that:

a.      with a combined offense level of **23** and criminal history category of I, the defendant's sentencing range would be a term of imprisonment of **46 to 57 months**, a fine of $20,000 to $200,000, and a period of supervised release of 3 years;

b.      with a combined offense level of **22** and criminal history category of I, the defendant's sentencing range would be a term of imprisonment of **41 to 51 months**, a fine of $15,000 to $150,000, and a period of supervised release of 3 years; or

c.      with a combined offense level of **21** and criminal history category of I, the defendant's sentencing range would be a term of imprisonment of **37 to 46 months**, a fine of $15,000 to $150,000, and a period of supervised release of 3 years.

Notwithstanding this, the defendant understands that at sentencing the defendant is subject to the maximum penalties set forth in ¶ 1 and 2 of this agreement.

14

21.     The government and the defendant agree to the correctness of the calculation of the Sentencing Guidelines range set forth above.  The government and the defendant, however, reserve the right to recommend a sentence outside the Sentencing Guidelines range. This paragraph reserves the right to the government and the defendant to bring to the attention of the Court all information deemed relevant to a determination of the proper sentence in this action.

22.     The defendant understands that the Court is not bound to accept any Sentencing Guidelines calculations set forth in this agreement or sentencing recommendations by the parties and that the defendant will not be entitled to withdraw the pleas of guilty based on the sentence imposed by the Court.

23.     In the event the Court contemplates any Guidelines adjustments, departures, or calculations different from those agreed to by the parties above, the parties reserve the right to answer any inquiries by the Court concerning the same.

## IV.  STATUTE OF LIMITATIONS

24.     In the event the defendant's plea[s] of guilty is/are withdrawn, or conviction[s] vacated, either pre- or post-sentence, by way of appeal, motion, post-conviction proceeding, collateral attack or otherwise, the defendant agrees that any charges dismissed pursuant to this agreement shall be automatically reinstated upon motion of the government and further agrees not to assert the statute of limitations as a defense to any federal criminal offense which is not time barred as of the date of this agreement.  This waiver shall be effective for a period

of six months following the date upon which the withdrawal of the guilty plea[s] or vacating of the conviction[s] becomes final.

## V.    REMOVAL

25.    The defendant represents that he is a citizen of the United States.  However, if the defendant is not a citizen of the United States, the defendant understands that, if convicted, the defendant may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

## VI. GOVERNMENT RIGHTS AND OBLIGATIONS

26.    The defendant understands that the government has reserved the right to:

a.    provide to the Probation Office and the Court all the information and evidence in its possession that the government deems relevant concerning the defendant's background, character and involvement in the offense charged, the circumstances surrounding the charge and the defendant's criminal history;

b.    respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government;

c.    advocate for a specific sentence consistent with the terms of this agreement including the amount of [restitution and/or] a fine and the method of payment;

d.    modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines including criminal history category, in the event that subsequent to this agreement the government receives previously unknown information, including conduct and statements by the defendant subsequent to this agreement, regarding the recommendation or factor;

e.    oppose any application for a downward departure and/or sentence outside the Guidelines range made by the defendant.

27.     At sentencing, the government will move to dismiss the open counts of Superseding Indictment 20-CR-104-A and Indictment 21-CR-31-A in these actions as against the defendant.

28.     The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

## VII.  RESTITUTION AND FINANCIAL PENALTY PROVISIONS

29.     The defendant understands, and the parties agree, that the Court must require restitution of $253,347 to be paid to the victims as set forth below as part of the defendant's sentence pursuant to Sentencing Guidelines § 5E1.1 and Title 18, United States Code, Section 3663A.   The defendant understands that the defendant will not be entitled to withdraw the pleas of guilty based upon any restitution amount ordered by the Court.   The defendant understands that a total of $253,347 will be paid to the victims as follows:

| Victim Name | Loss Amount |
|---|---|
| Small Business Administration | $215,997 |
| Key Bank | $37,350 |
| TOTAL | $253,347 |

30.     The defendant agrees to disclose fully and completely all assets in which the defendant either has any property interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. The defendant agrees to make complete financial disclosure to the United States by truthfully executing a sworn financial statement by the deadline set by the United States, or if no deadline is set, no later than two weeks prior to the date of sentencing. The defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information. The defendant agrees to discuss or answer any questions by the United States relating to the defendant's complete financial disclosure. The defendant will submit to an examination under oath and/or a polygraph examination conducted by an examiner selected by the U.S. Attorney's Office on the issue of the defendant's financial disclosures and assets, if deemed necessary by the U.S. Attorney's Office. The defendant certifies that the defendant has made no transfer of assets in contemplation of this prosecution for the purpose of evading or defeating financial obligations that are created by the agreement and/or that may be imposed upon the defendant by the Court. In addition, the defendant promises that the defendant will make no such transfers in the future.

31.     The defendant agrees that any financial records and information provided by the defendant to the Probation Office, before or after sentencing, may be disclosed to the United States Attorney's Office for use in the collection of any unpaid financial obligation.

32.     The defendant understands and agrees that the Court, at the time of sentencing, will order that all monetary penalties imposed at that time (including any fine, restitution, or special assessment imposed in accordance with the terms and conditions of this plea agreement) are to be due and payable in full immediately and will be (i) subject to immediate enforcement as provide for in Title 18, United States Code, Section 3613, and (ii) submitted to the Treasury Offset Program ("TOP") so that any federal payment or transfer of returned property the defendant receives may be offset and applied to federal debts but will not affect any periodic payment schedule set by the Court.

33.     The defendant understands and acknowledges that any schedule of payments imposed by the Court at the time of sentencing is merely a minimum schedule of payments and does not, in any way, limit those methods available to the United States to enforce the judgment.

34.     The defendant agrees that any funds and assets in which the defendant has an interest, which have been seized or restrained by the government or law enforcement as part of the investigation underlying this plea agreement, and not subject to forfeiture, will be used to offset any judgment of restitution and fine imposed pursuant to this plea agreement, or to satisfy any debts owed by the defendant to the United States and/or agencies thereof.

35.     To the extent that the defendant has an interest, the defendant authorizes the District Court Clerk to release any funds posted as security for the defendant's appearance bond in this case, which funds shall be applied to satisfy the financial obligation(s) of the defendant pursuant to the judgment of the Court.

36.     The defendant is aware that voluntary payment of restitution prior to adjudication of guilt is a factor in considering whether the defendant has accepted responsibility under the United States Sentencing Guidelines §3E1.1.

## VIII.  APPEAL RIGHTS

37.     The defendant understands that Title 18, United States Code, Section 3742 affords a defendant a limited right to appeal the sentence imposed.  The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 20(a), above, notwithstanding the manner in which the Court determines the sentence.   In the event of an appeal of the defendant's sentence by the government, the defendant reserves the right to argue the correctness of the defendant's sentence.

38.     The defendant understands that by agreeing to not collaterally attack the sentence, the defendant is waiving the right to challenge the sentence in the event that in the future the defendant becomes aware of previously unknown facts or a change in the law which the defendant believes would justify a decrease in the defendant's sentence.

39.     The government waives its right to appeal any component of a sentence imposed by the Court which falls within or is greater than the sentencing range for imprisonment, a fine and supervised release set forth in Section III, ¶ 20(c), above, notwithstanding the manner in which the Court determines the sentence.  However, in the

20

event of an appeal from the defendant's sentence by the defendant, the government reserves its right to argue the correctness of the defendant's sentence.

## IX. FORFEITURE PROVISIONS

40.     As a condition of the plea, the defendant agrees to immediately forfeit all of the defendant's right, title and interest to any and all assets which are subject to forfeiture pursuant to Title 18, United States Code, Sections 924(d) and 3665 (firearm and ammunition), and Title 18, United States Code, Sections 982(a)(2) and 981(a)(1)(C) (bank accounts) and Title 28, United States Code, 2461(c). That property includes:

**FIREARM/AMMUNTION:**

a.     One (1) Harrington and Richardson, Model Topper 88, 12-gauge shotgun, bearing serial number AU519161;

b.     Ten 12-gauge rounds of ammunition labeled "REMINGTON 12 GA" on the headstamp;

c.     33 9mm Luger caliber rounds of ammunition labeled "Blazer 9mm LUGER" on the headstamp; and

d.     40 .223 REM caliber rounds of ammunition labeled "Tulammo 223 Rem" on the headstamp.

**BANK ACCOUNTS:**

a.     $114,063.53 seized from Bank of America account ending in 8963, held in the name of MedCor Staffing Inc., by law enforcement on or about May 12, 2020;

b.     $45,454.82 seized from Key Bank account ending in 6111, held in the name of MedCor Staffing Inc., by law enforcement on or about February 11, 2021; and

c.     $3,350.61 seized from Key Bank account ending in 6103, held in the name of Tatonka Industries LLC, by law enforcement on or about February 11, 2021.

41.     The defendant also agrees that the property listed above is properly forfeitable to the United States pursuant to Title 18, United States Code, Sections 924(d) and 3665 and Title 18, United States Code, Sections 982(a)(2) and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c). The defendant further agrees to fully assist the government in the forfeiture of the aforementioned property and to take whatever steps are necessary to pass clear title to the United States, including, but not limited to surrender of title and execution of any documents necessary to transfer the defendant's interest in any of the above property to the United States, as deemed necessary by the government.

42.     After the acceptance of the defendant's guilty plea, and pursuant to Rule 32.2(b)(2) of the Federal Rules of Criminal Procedure, the Court will issue a Preliminary Order of Forfeiture for the items listed above.  The defendant hereby waives any right to notice of such Preliminary Order of Forfeiture.  The defendant further consents and agrees that the Preliminary Order of Forfeiture and a Final Order of Forfeiture shall issue and become final as to the defendant prior to sentencing and agrees that it shall be made part of the defendant's sentence and included in the judgment pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure.   The defendant further agrees to waive any time restrictions or requirements as provided in Title 18, United States Code, Section 983, any notice provisions in Rules 32.2 and 43(a) of the Federal Rules of Criminal Procedure regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant acknowledges that the defendant understands that the forfeiture of property is part of the sentence that may be imposed in this case and waives any failure by the Court to advise the defendant of this,

pursuant to Rule 11(b)(1)(J) of the Federal Rules of Criminal Procedure, at the time the guilty plea is accepted. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

43.     The defendant further agrees that the forfeiture of the aforementioned assets as authorized herein shall not be deemed an alteration of the defendant's sentence. Forfeiture of the defendant's property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. However it is understood by the defendant that the government may, in its discretion, recommend to the Attorney General that any of the forfeited proceeds be remitted or restored to eligible victims of the offense, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. Pt. 9, and other applicable law, it being understood that the United Attorney's Office has authority only to submit such request and that the final decision of whether to grant relief rests with the Department of Justice, which will make its decision in accordance with applicable law. The defendant understands that one factor that will be considered by the government will be any other assets the defendant has available to him to be able to pay any restitution judgment and the defendant shall have no recourse in the event the restoration request is denied.

44.     The defendant knowingly, intelligently, and voluntarily waives his right to a jury trial on the forfeiture of the assets. The defendant knowingly, intelligently, and voluntarily waives all constitutional, legal and equitable defenses to the forfeiture of these assets in any proceeding, including any jeopardy defense or claim of double jeopardy, whether

constitutional or statutory, as to this criminal proceeding or any related civil or administrative proceeding. The defendant further agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine regarding the forfeiture of assets by the United States.

## CIVIL FORFEITURE PROCEEDINGS

45.     The defendant acknowledges that the government has commenced a civil forfeiture action against $114,063.53 United States currency seized from Bank of America Account #8936. *See* 20-CV-1931. As a condition of the plea, the defendant agrees to provide and execute any other documents the United States deems necessary to resolve and dismiss the civil litigation. The defendant understands that parties in the civil action will submit Petitions for Remission requesting that a portion of the $114,063.53 seized from Bank of America account ending in 8963, held in the name of MedCor Staffing Inc., by law enforcement on or about May 12, 2020, be remitted to the parties pursuant to 18 U.S.C. § 981(e), 28 C.F.R. Pt. 9, and other applicable law, it being understood that the United Attorney's Office has authority only to submit the Petitions for Remissions to the Department of Justice and that the final decision of whether to grant relief rests with the Department of Justice, which will make its decision in accordance with applicable law. The defendant understands that any funds remitted to the parties in the civil action may be deducted from the forfeited  proceeds that will subject to any restoration request described in Paragraph 43 above.

## ABANDONMENT

46.     As a condition of the plea, the defendant agrees not to contest any abandonment proceeding against the following property:

    a.      Approximately 5,000 COVID-19 test kits seized by law enforcement from Med-Cor Staffing on or about April 23, 2020, and pending abandonment proceedings.

47.     The disposition of the property will be effectuated by the abandonment proceedings initiated by the Department of Homeland Security's protocols.  The defendant agrees that the property was used in the underlying conduct which forms the basis of this Plea Agreement and waives any and all statutory and constitutional rights to contest such abandonment proceedings, including but not limited to time restrictions and notice provisions with respect to the final disposition of the above property.

48.     The defendant understands that the United States and any law enforcement agency acting on behalf of the United States may, in its discretion, destroy any or all of the property referred to in this agreement.

49.     The defendant agrees that in the event this plea agreement is voided for any reason, the above agreements for the forfeiture, abandonment and disposition of the firearm, ammunition, bank accounts and COVID-19 test kits, shall be given full force and effect.

## X. <u>TOTAL AGREEMENT AND AFFIRMATIONS</u>

50.     This plea agreement represents the total agreement between the defendant,

JOSEPH BELLA, and the government.  There are no promises made by anyone other than

those contained in this agreement.  This agreement supersedes any other prior agreements,

written or oral, entered into between the government and the defendant.


                                     TRINI E. ROSS
                                     United States Attorney
                                     Western District of New York

                        BY: _____
                                     NICHOLAS T. COOPER
                                     Assistant United States Attorney

                                     Dated:  June 27, 2022


        I have read this agreement, which consists of 26 pages.  I have had a full opportunity

to discuss this agreement with my attorney, Thomas J. Eoannou, Esq.  I agree that it

represents the total agreement reached between myself and the government.  No promises or

representations have been made to me other than what is contained in this agreement.  I

understand all of the consequences of my pleas of guilty.  I fully agree with the contents of

this agreement.  I am signing this agreement voluntarily and of my own free will.


_____          _____
JOSEPH BELLA                                      THOMAS J. EOANNOU, ESQ.
Defendant                                         Attorney for the Defendant

Dated: June 27, 2022                              Dated: June 27, 2022